Gary G. **BUNTING**, as father and next friend of Bradley Bunting, a minor, Petitioner,

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 88–48V.

United States Claims Court.

March 5, 1990.

Al Millar, Jacksonville, Fla., attorney of record, for petitioner.

Michael P. Milmoe, Washington, D.C., with whom was Asst. Attys. Gen. Stuart M. Gerson and John Lodge Euler, Civil Div., Washington, D.C., for respondent. Gemma Flamberg, Office of General Counsel, Dept. of Health and Human Services, Washington, D.C., of counsel.

## OPINION [1]

HARKINS, Senior Judge.

Gary B. Bunting on November 14, 1988, filed a petition for compensation under the National Vaccine Injury Compensation Program (the Program) [2] on behalf of his son Bradley Bunting. Diphtheria-tetanus-per-

---

1. This opinion may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within 14 days of the date of filing this opinion, the parties shall designate any material subject to section 300aa–12 and such designated material will be deleted for public access. If on review of this opinion there are no objections filed within the 14–day period, then it shall be deemed that there is no material subject to section 300aa–12.

2. National Childhood Vaccine Injury Act of 1986, as amended, by the Omnibus Budget Rec-

onciliation Act of 1987, Pub.L.No. 100–203, Title IV, Dec. 22, 1987, 42 U.S.C. §§ 300aa–1 et seq. (*See* U.S.C.A.1989 Supp.). Procedures and standards in the Program were amended substantially in the Omnibus Budget Reconciliation Act of 1989, Pub.L.No. 101–239, effective Dec. 19, 1989. Pursuant to section 6601(s)(1)(B) of Pub. L.No. 101–239, this case is to proceed under the Program in accordance with the law in effect before Dec. 19, 1989. For convenience, further reference will be to the relevant subsection of "42 U.S.C. § 300aa."

tussis (DTP) vaccine was administered to Bradley Bunting on March 2 and May 7, 1984, and compensation is sought for injuries that were suffered thereafter.[3]

Bradley Bunting's current condition is that he has an encephalopathy, a disorder of brain function. The encephalopathy is manifested by psychomotor retardation and intractable seizures. He has a history of infantile spasms. Bradley Bunting's condition is diagnosed as permanent, with no recovery foreseeable. He requires constant custodial care, and will need physical, occupational, and speech therapy.

This case has been complex procedurally. A representative of the Attorney General appeared as attorney of record for respondent on December 13, 1988. An answer was filed on December 27, 1988, and discovery and other pretrial activities were started. On May 9, 1989, the attorney of record notified the court that he had resigned from the Civil Division of the Department of Justice, effective May 7, 1989. Until an attorney from the Office of General Counsel, HHS, entered an appearance on October 10, 1989, as a new attorney of record, respondent was not represented in these proceedings. On February 20, 1990, an attorney from the Department of Justice entered an appearance as attorney of record for respondent.

On July 11, 1989, respondent attempted to submit a Vaccine Injury Compensation Program medical review of the claim (VICP medical review). The special master did not accept the VICP medical review, and it was returned, unfiled, to respondent on July 17, 1989. Notwithstanding a lack of representation for respondent, a hearing was held on July 13, 1989. During the hearing, petitioner presented additional evidence by means of documentary materials and in testimony by deposition or by appearance.

The special master's report, filed September 18, 1989, recommended an award of compensation that totaled $2,619,409.21, for a vaccine-related encephalopathy and a residual seizure disorder.[4] These injuries were found to be compensable within the guidelines for a Table injury under section 14(a)(I)(B) & (D), section 14(b)(2)(B), or a Table condition under section 14(b)(3)(B).

On October 10, 1989, an attorney of record filed a notice of appearance for respondent and an objection to the special master's report and recommendation. Respondent's objection contended that the special master erred in finding that Bradley Bunting's injuries satisfied the requirements of the Vaccine Injury Table. In addition, respondent's objection asserted the special master erred in finding that petitioner had proved by a preponderance of the evidence that the injury was caused by the vaccine. Respondent's October 10, 1989, objection also contended that the special master's failure to consider the VICP medical review was error under the Vaccine Act, and that the special master had interpreted section 15(b) of the Act erroneously as to compensation for attorneys' fees, loss of earnings and pain and suffering.

Examination of the record resulted in an order on December 15, 1989, that concluded the deficiencies in the special master's report required de novo determination of the findings of fact and conclusions of law relative to (1) eligibility for compensation, (2) calculation of cost of future medical expenses, (3) calculation of attorneys' fees and other costs, and (4) the amount of any judgment to be entered.[5] The December

---

3. Inasmuch as the vaccine was administered before Oct. 1, 1988, the effective date of the Program, provisions limiting compensation for retrospective cases are applicable.

4. The recommended amounts, included $2,143,-460 for future medical expenses under section 15(a)(1)(A); $449,000 for loss of earnings under section 15(a)(3)(A); and $26,949.21 for attorneys' fees and other costs.

5. Section 12(d)(1) provides:

Upon objection by the petitioner or respondent to the proposed findings of fact or conclusions of law prepared by the special master or upon the court's own motion, the court shall undertake a review of the record of the proceedings and may thereafter make a de novo determination of any matter and issue its judgment accordingly, including findings of fact and conclusions of law, or remand for further proceedings.

15, 1989, order established the procedure to be followed in de novo consideration of these issues. The procedure would establish on the record petitioner's intention as to exercise of the right to withdraw the petition.[6] In the event the petition was not withdrawn, the parties were to file a notice of intent (a) to stand on the present record, or (b) to submit additional information. The parties were given 30 days to supplement the record with additional materials.

On January 2, 1990, petitioner moved for reconsideration of the December 15, 1989, order, and gave notice that there was no intention to withdraw the petition. The motion to reconsider was denied, and subsequently, both parties filed additional material to supplement the record.

The term "record" is defined in the Vaccine Act as the record established by the United States Claims Court in a proceeding on a petition filed under section 300aa–11 of this title.[7] Accordingly, the record is limited to materials that have been filed with the court's Clerk.

In keeping with the Program objective for a speedy, informal determination of a claim, the Act specifies the type of supporting materials that are to accompany the petition. Such materials are to include available relevant medical records, and materials appropriate to determination of the amount of compensation.[8]

The petition initially filed on November 14, 1988, was incomplete. Supplements to the record were delivered and filed piecemeal: by letter to HHS on December 19, 1988 (filed Feb. 6, 1989); at the hearing on July 13, 1989; and on August 2, 1989, pursuant to order at the hearing. In accordance with the December 15, 1989, procedure for de novo consideration, both petitioner and respondent delivered supplementary material on January 26, 1990.

The medical records of the obstetrician were produced at the July 13, 1989, hearing. Medical records of the pediatrician in part were attached to the petition, additional records were included in the December 19, 1988, delivery, and another group was produced at the July 13, 1989, hearing. Part of the medical records of the neurologist who had treated Bradley Bunting regularly after age eight months, was attached to the petition, and additional records of the treating neurologist were delivered with the December 19, 1988, letter. Medical records of Humana Hospital, Fort Walton Beach, Florida, relative to the birth and early pediatric care were delivered in part with the petition, in part attached to the December 19, 1988, letter, and in part at the July 13, 1989, hearing. Records from Nemours Childrens Hospital, Jacksonville, Florida, relative to treatment in the neurology clinic after September 4, 1984, were delivered in part with the petition, in part attached to the December 19, 1988, letter and in part at the July 13, 1989, hearing.

The medical records cover the period of Bradley Bunting's prenatal care and birth

6. Section 21(b) provides:

> If the United States Claims Court fails to enter a judgment under section 300aa–12 of this title on a petition filed under section 300aa–11 of this title within 365 days after the date on which the petition was filed, the petitioner may submit to the court a notice in writing withdrawing the petition. Such a notice shall be filed not later than 90 days after the expiration of such 365–day period. A person who has submitted a notice under this subsection may, notwithstanding section 300aa–11(a)(2) of this title, thereafter maintain a civil action for damages in a State or Federal court without regard to subpart B of this part and consistent with otherwise applicable law.

7. 42 U.S.C. § 300aa–13(c).

8. Section 11(c)(2) and (3) provide:

> A petition for compensation under the Program for a vaccine-related injury, or death shall contain—
> (2) all available relevant medical records (including autopsy reports, if any) relating to the person who suffered such injury or who died from the administration of the vaccine and an identification of any unavailable records known to the petitioner and the reasons for their unavailability, and
> (3) appropriate assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury or who died from the administration of the vaccine.

on December 29, 1983, to the hearing in 1989, and were made contemporaneously with the events described. Inasmuch as the medical records were assembled piecemeal at different times, and produced selectively at various stages of the proceeding, they do not reflect the winnowing of routine or redundant items, or the orderly arrangement and identification, that is customary in pretrial preparation in an adversarial proceeding. They are not indexed or arranged in any consistent chronological order, and they contain many duplicatory items.

Testimony through a deposition of the neurologist at Nemours Childrens Hospital, and in person by Bradley Bunting's parents and by petitioner's expert witness, was given in July 1989. The testimony largely was based on recollection rather than documentation, was not subject to cross-examination, and in some respects is inconsistent with the contemporaneous medical records of the event described. Testimony of petitioner's expert witness was not based on examination of all relevant medical records.

For purposes of this de novo consideration, the record is as follows:

1. The November 14, 1988, petition, with attachments, Tabs A through F (Initial Delivery);

2. Letter dated December 19, 1988, from Gary Bunting to HHS Director Bureau of Health Professions, Rockville, Maryland, with attachments, Tabs A through D, filed February 6, 1989 (Additional Delivery);

3. Transcript of hearing, July 13, 1989;

4. Petitioner's exhibits admitted at hearing, Nos. 1 through 9;

5. Petitioner's posthearing exhibits, filed August 2, 1989—Nos. 10 through 17;

6. Petitioner's supplementary material, filed January 26, 1990; and

7. Respondent's supplementary material, filed January 26, 1990.

*Facts*

Bradley Bunting was born December 29, 1983, after a gestation period of 37 weeks. The pregnancy and delivery were within normal limits. The pediatrician's records delivered at the July 13, 1989, hearing contain an office note, dated July 23, 1984, from a neurologist at the Medical Center Clinic (MCC), Pensacola, Florida, who had examined Bradley Bunting and had discussed his condition with his parents, that states "Mother took no medications during her pregnancy." [9]

The medical records of the obstetrician indicate that Bendectin was prescribed for Glenda Bunting on June 7, 1983. The admitting note dated September 4, 1984, by the neurologist at Nemours Childrens Hospital, states mother "took some medication for vomiting when she was pregnant for one month (medication now drawn from the market, doesn't know the name)." The Discharge Summary of the Nemours Childrens Hospital, dated September 15, 1984, under Past Medical History states: "Mother had nausea at one month of pregnancy. She received some tablet, doesn't know the name which was removed from the market."

The pediatrician's records show that the first DTP vaccination was March 2, 1984. The physician's charge slip of the White–Wilson Medical Center (WWMC) for March 2, 1984, indicates that Bradley had otitis media. The pediatrician's record for an examination on March 27, 1984, indicates "No problems." The second DTP vaccination was administered May 7, 1984. There is no entry in the pediatrician's records that indicates any abnormal episodes or condition between the first and second DTP vaccinations. The pediatrician's records have no entry beside the date for June 15, 1984.

The records of Humana Hospital, Fort Walton Beach, state that Bradley on June 27, 1984, got sick and was seen by a doctor in Jacksonville and that his mother noted the first seizure on June 28, 1984, which was described as "distant appearance in

---

9. Entries in the medical records commonly use the abbreviated format for reference to

month/day/year, *i.e.,* 7/23/84 or 7-23-84.

eye and jack knife movements." Initially, the episodes were thought to be due to ear pain. Between June 28 and July 3, 1984, Bradley had multiple jack knife episodes, some of which were recorded in the pediatrician's notes at the WWMC. The pediatrician's note for July 3, 1984, describes an episode as "moan like groaning—pain, eyes get big, hands fold fist and arms bend, no loss of consciousness, listless afterwards, cries." The July 3, 1984, note indicates the otitis had cleared and scheduled an EEG.

Bradley was admitted to the Humana Hospital on July 3, 1984. A 30 second seizure was noted on July 4, 1984, at 11 a.m.—as a rightsided arm jerk and looking to left. On July 4, 1984, a spinal fluid analysis, brain CT scan, and an EEG were made. The spinal fluid analysis and CT scan were noted as normal. The Humana records show the EEG was requested on July 4. The request form includes: "Reason for Request—1 wk ago began having seizure like episodes eyes to left" and "Seizures (Describe): Body rigid 2–3 minutes, daily." The report on the EEG, dated July 10, 1984, contains: "Impression: Abnormal EEG with bilateral spike and wave activities occurring independently consistent with seizure disorder." Bradley was discharged from Humana Hospital on July 5, 1984.

After the discharge, Bradley continued to experience seizures. The pediatrician's records indicate that on July 15, 1984, Bradley had three afebrile seizures. The pediatrician referred Bradley to a neurologist at the Medical Center Clinic in Pensacola, for evaluation of the seizures. The neurologist examined Bradley and discussed a treatment program with the parents. By letter dated July 23, 1984, the neurologist advised the pediatrician: "At this point, I don't know whether he has infantile spasms or not." The letter also advised that institution of treatment with ACTH was not warranted at that time. Bradley then was being given Phenobarbital and Dilantin. The neurologist recommended making changes in these medications, but if the seizures were not under control relatively soon Depakane should be started.

The neurologist's July 23, 1984, letter enclosed a copy of his office notes. The notes describe the seizures as follows:

... He was doing well until around the first of July when he started having seizures. He has been rolling from front to back, from back to front, pushing his head up. He will maintain a sitting posture but can't actually get into a sitting posture. He is scooting but not crawling. He does seem perhaps to be developing a left hand preference. As mentioned, around the first of July, he starting having seizures. He will generally have them in spurts 3 or 4 times a day. He will turn his head and eyes to the left and slump forward, usually with his arms extended. He will straighten up as soon as this starts and perhaps do it again. May do it 4 or 5 times in succession and then stop and not do it again for several hours. He does it off and on and during the day, he does it in his sleep.

With respect to the seizure disorder, the notes include the following:

Discussed this in detail with the parents. Major concern at this point is whether he has a partial seizure with a rapid secondary generalization or whether these are infantile spasms. The age, onset and character of the seizure, as well as the nature of the seizure would be virtually compatible with either. The EEG pattern would be compatible with either. Certainly, one thinks about hypsarrhythmia when one thinks about infantile spasms but this EEG may evolve into this pattern as time goes on.

We discussed the different approaches to medication at this time. I explained to them a great deal about infantile spasms, told them that the treatment of choice is ACTH but that I don't like to jump right into this until we are certain about the diagnosis because of the potential problems. Did also explain to them that the sooner the treatment is undertaken, the more effective it is felt to be. I recommended to them that we try vigorously to establish seizure control with other medications as rapidly as possible so if in a month or two, we haven't accomplished

anything, that we would go ahead and treat him for infantile spasms.

On September 4, 1984, Bradley was admitted to Nemours Childrens Hospital, Jacksonville, Florida. The admission memorandum prepared September 4, 1984, states he "has been referred to the Neurology Clinic by the Epilepsy Foundation for possible infantile spasm." The memorandum summarized his history in part as follows:

"... He was developing normally when about 5½–6 months old he started having episodes in which his eyes and head were turned to the left. The arms would flex at the elbows and he would bend forward, these episodes would come in clusters about 5–10 and lasting for about 15–minutes.... At the present time he is taking 64 mg. of Phenobarb and 250 mg. of Dilantin per day. Dilantin level today is 28.4 microgm. per ml. and Phenobarb level is 44.2. According to the parents the spasms have changed since he was put on the medications, they consist of head nodding about 1–3 times a day, and he has real bad spasms in which he bends forward after about 3–4 days usually when he is getting up from sleep or going to sleep."

The admission memorandum includes a summary which states in part:

"Impression: At this time, infantile spasm, probably secondary to tuberous sclerosis."

Bradley was discharged from Nemours Childrens Hospital on September 14, 1984. The Discharge Summary dictated September 15 and typed September 22, 1984, includes:

ADMITTING DIAGNOSIS: Infantile spasms with mildly diffuse atrophy of brain on CAT scan.

Obesity.

Otitis media.

The section on History of Present Illness includes:

He was well until 7/4/84 when mother noticed that he was sitting and bending his head forward with flexing the arms for about 10 times a day. She called a private doctor and he thought this was related to his otitis media which was present at the time, but since then it was over and over for about 15–20 times for 15 to 20 minutes at a time.

The section on Hospital Course included:

PROBLEM NO. 1. Seizure activity. Patient kept on Phenobarb 5 mg/kilo/day divided twice a day, no improvement noted in the hospital. ACTH was started after 2 days on 80 units every day. The patient showed improvement. Patient finally did fine.

During this hospitalization, Bradley was examined extensively. The Discharge Summary includes the following statement on Laboratory Data:

CBC with Diff and Platelets within normal limits except for hemoglobin and hematocrit was 12.7/37.3. Metabolic screening for urine was negative. CAT scan showed mildly diffuse atrophy. EEG showed arrhythmia and no improvement on Pyridoxine and overdevelopment showed delayed development. PPD and Candida skin test was negative. Phenobarb level was kept around 25. Ophthalmology consultation-nonspecific finding. Retinal pigment epithelial effect. Hearing consultation still pending.

During this hospitalization, Bradley was given EEG tests on September 5, September 10 and September 14, 1984. The reports were signed by the child neurologist in charge of Bradley's treatment. The September 5 test report, typed September 7, 1984, includes the following:

IMPRESSION: This EEG is highly abnormal. Features are those of hypsarrhythmia.

The September 10 test report, typed September 10, 1984, includes the following:

This record is severely abnormal by virtue of the high amplitude generalized slowing which is associated with multifocal asynchronous spike, and polyspike wave discharges, the features are compatible with hypsarrhythmia. It is not responsive to intravenous Pyridoxine.

The September 14 test report, typed September 17, 1984, includes the following:

IMPRESSION: The record remains hypsarrhythmic.

During the period September 15, 1984, to February 22, 1985, the Nemours Childrens Hospital Neurology Clinic continued the testing and treatment program established by the neurologist attending Bradley. This program included a variety of regiments of anticonvulsant therapy, laboratory testing, physical examination, dietary controls, and consultations with and advice to Bradley's parents. The Hospital's medical records show visits to the Neurology Clinic in 1984 on:

September 20, 25;

October 2, 9 and 18;

November 1, 8, 15, 21 and 29;

December 4, 11, 21 and 31.

Visits in 1985 were on:

January 7; and

February 4, 8 and 22.

Although in the September and October visits there appeared to be some improvement in control over the seizures, the changes in medication did not produce beneficial results. The records for each of the visits include entries that show the patient "continues with infantile spasms" or "continued infantile spasms." The neurologist's report for the November 1, 1984, visit includes the following:

IMPRESSION: INFANTILE SPASMS, NOT CONTROLLED WITH COMBINATION ACTH, PHENOBARBITAL, AND DEPAKENE.

Improvement with reinstitution of Phenobarbital.

The report by the Neurology Clinic coordinator for the November 8, 1984, visit includes the following:

IMPRESSION: Resolving bilateral otitis media, continued seizure activity.

and for the November 29, 1984, visit the coordinator's report includes:

IMPRESSION: Infantile spasms, not controlled with combination of ACTH, Phenobarbital and Depakene. There has been some improvement with the re-institution of the ACTH, 80 units on a daily basis.

On December 31, 1984, the neurologist wrote the following note:

Bradley is brought by his mother this morning for follow-up. He is maintained on ACTH 40 units daily together with Depakene and phenobarbital. There has been no significant improvement in the frequency of his infantile spasms. They are occurring an average 4–5 times daily with episodes of repetitive, brief, myoclonic activity. The seizures themselves appear to have little effect on his general behavior. He usually remains conscious and following an episode of spells may only develop some minimal irritability. Developmentally, is still lagging by 2–3 months, however. He continues to make progress. He can now sit independently. He has a free reach and transfer. Socially he is age appropriate.

He has no localizing or lateralizing signs. There is no evidence of drug intoxication. I have decided to go back to full doses of ACTH 80 units daily in the hope that we see some improvement in the frequency of his spasms.

On February 22, 1985, the Neurology Clinic coordinator's prehospitalization summary included the following:

He was admitted from clinic to Nemours to work up of seizure activity. An EEG showed hypsarrhythmia with no improvement with Pyridoxine. Bradley was started on ACTH 80 unit q.d. He was also placed on a diet for obesity. The phenobarbital was maintained, but he was taken off Dilantin. An ophthalmology exam to rule out tuberous sclerosis was done and had nonspecific findings. CT showed mild diffuse atrophy of brain and BAER's were within normal limits. After 11 days in Nemours Bradley was discharged and followed on a weekly basis through the clinics for monitoring of levels, B/P, and stools.

After three weeks ACTH was tapered to 80 units q.o.d. There had been no major change in spasms, but decreased alertness was noted. After about two weeks Depakene was started (2 cc.'s t.i.d.) and phenobarbital discontinued, increased spasm noted at this time and phenobarbi-

tal was restarted a week later. Around two months after beginning ACTH increased to 40 units q-day. After a couple of weeks of continued frequent spasms ACTH upped back to 80 units per day. After Christmas Bradley went back to Fort Walton—at that time he was again put back on 40 units a day, and continued on phenobarbital 20 mg. b.i.d. Depakene 2.5 cc.'s p.o.t.i.d. At that time his weight was 13.4 kgs. (up from 12.6 kg. previously).

Bradley was admitted to Nemours Childrens Hospital on February 22, 1985, and was discharged on March 1, 1985. The Discharge Summary, typed April 18, 1985, states: "Final Diagnosis: Infantile Spasms."

During this hospitalization, additional laboratory tests were administered. The Discharge Summary in this regard states:

LAB DATA: Initially consisted of laboratory workup with CBC and Differential. WBC 13.2, RBC 3.99. Hemoglobin 13.6, hematocrit 14.1, with Segs 37, lymphs 59. The ASTRA and chemical profile were within normal limits. Urinalysis was normal. The patient's stools were to be guaiaced and during hospital stay they were all negative. The urine sugar and acetone were to be monitored because the patient was on ACTH. Medications consisted of ACTH 40 units every other day IM, Phenobarbital 20 mg. b.i.d. PO, and Depakene 200 mg. t.i.d. PO. Initial Phenobarbital level was 90.5, and Depakene was 82. Follow up Phenobarbital level on 2/26/85 was 19.9. The patient's diet was initially a reducing diet as per the mother. Later on the patient was placed on ketogenic diet. A Dietary consult was also requested. The following day the Depakene was discontinued, ACTH was decreased to 20 units every other day. The patient was continued on the same Phenobarbital dosage. Other workup consisted of Denver Development Examination that showed the patient to have an overall developmental delay in all areas from about 2 to 4 months.

After discharge on March 1, 1985, the clinic continued to follow up with treatment for infantile spasms. The Hospital records show visits to the clinic in 1985:

March 4, 11, 13, 15, 18, and 26;
April 2;
May 8;
July 16 and 30;
August 12;
October 11; and
November 15.

The Hospital records show on February 24, 1986, Bradley's mother advised by telephone the family had moved to Orlando, and they had been referred to a neurologist there but could not get an appointment until March. The Neurology Clinic continued to follow and supervise Bradley's treatment by telephone contacts and periodic visits to the treating neurologist. The clinic note records show a visit on September 2, 1986, and telephone consultations on: September 12, October 16, November 4 and December 12, 1986.

In all of the medical records and reports, the subject matter is concerned with treatment for infantile spasms. The clinic progress note for the March 15, 1985, visit, for example, states:

IMPRESSION: 1) Right serous otitis
2) Infantile spasms, not under control
3) Ketosis, not yet achieved

The clinic progress note for the March 18, 1985, visit includes:

ASSESSMENT: 1. Continued infantile spasms
2. Right serous otitis and ketosis not yet achieved.

The treating neurologist's report, after the July 16, 1985, visit includes:

Bradley appears unchanged. His seizures have not responded in any consistent way to therapeutic levels of phenobarbital, Depakene, and ACTH. The plan is to obtain a repeat electroencephalogram and consider the possibility of Tregretol therapy. His phenobarbital level today was 9.0. We will see Bradley back in the clinic in 3 months.

The Nemours Childrens Hospital medical records include reports by the neurologist

on EEG tests that were made: February 25, 1985; July 16, 1985; September 2, 1985; March 23, 1987; and May 27, 1988.

The report on the February 25, 1985, EEG includes:

IMPRESSION: This record is abnormal by virtue of persistent interhemispheric asymmetry indicative of a left hemispheric abnormality. No beneficial affect is seen with administration of intravenous Pyridoxine 100 mg.

The report on the July 16, 1985, EEG includes:

IMPRESSION: This record is severely abnormal by virtue of the frequently discharging paroxysms of high amplitudes, spike and poly sharp activity which is asynchronous and multi focal. The appearances are compatible with hypsarrhythmia.

The reports for the September 2, 1986, and March 23, 1987, EEG each contain the statement: "The features are compatible with hypsarrhythmia."

The report for the May 27, 1988, EEG test includes:

IMPRESSION: The record is abnormal by virtue of the high amplitude disorganized slowing of the background rhythms which is associated with multifocal asynchronous spike and polyspike wave discharges which occur in a localized and generalized pattern. The tracing is that of hypsarrythmia. There has been no improvement since his previous tracings of March, 1987.

After the Bunting family moved in February 1986, the treating neurologist continued supervision of Bradley's treatment program through Bradley's visits to the Hospital's Neurology Clinic and consultations with a new pediatrician in Longwood, Florida. The Hospital's records indicate that this relationship continued to September 9, 1988, and the deposition submitted at the July 13, 1989, hearing states the treating neurologist's relationship was ongoing at that time.

After an examination of Bradley on August 28, 1986, the treating neurologist by letter to the new pediatrician provided extensive background on previous treatment and reported that the "infantile spasms" continued unabated. The letter included the following comment:

He has an encephalopathy of undetermined cause, probably prenatal in origin. It is manifest by severe psychomotor delay, infantile spasms and right hemiparesis.

After a follow up examination on October 20, 1986, the treating neurologist's letter included the following description:

He did not communicate during the examination. There was no eye contact and he did not respond to socialization or verbalization. He seemed fairly isolated and unable to relate to his parents. His behavior was fairly typical of autistic retardation.

The report also included the following:

IMPRESSION: Prenatal encephalopathy manifest by severe developmental psychomotor delay, hypotonic right hemiparesis and infantile spasms. At the present time, he is not controlled. ACTH although providing some benefit, has certainly not eliminated his spasms.

Letters after examinations on December 2, 1986, March 23, 1987, and May 27, 1988, include statements that described Bradley's condition as an encephalopathy manifest by psychomotor delay and infantile spasms, that the underlying etiology of the encephalopathy was undetermined, and that treatment with a variety of anti-epileptic medications had not been successful. The May 27, 1988, letter to the new pediatrician included the following:

... We have, as you know, tried Bradley on virtually every anti-convulsant agent known to man. The parents are being marvelous in their consistency and concern for Bradley's well being.

The EEGs continued to show evidence of hypsarrythmia. After the follow up examination on July 15, 1988, the treating neurologist's letter to the new pediatrician included:

IMPRESSION: Bradley has an encephalopathy of undetermined etiology. It is manifest by psychomotor retardation, language and learning delay, autistic be-

havior, and mild right hemiparesis. Despite anti-epileptic therapy, we have made little impact on his seizure disorder.

The treating neurologist requested a colleague at Nemours Childrens Hospital to review the data and to examine Bradley in a joint consultation. This reevaluation examination occurred on September 9, 1988. It included discussion with the parents and with the treating neurologist, and a physical examination of Bradley. The report by the colleague consultant identifies the condition as an "intractable myoclonic seizure disorder." The letter in this regard states:

It was my pleasure to see Bradley at the request of [treating neurologist] for re-evaluation of his intractable myoclonic seizure disorder. A review of his history reveals an unremarkable birth with a weight of 7 pounds 6 ounces. Early growth and development were normal. His father reports following an early DPT immunization, he had decreased use of his right hand and at 4 to 5 months of age, had one episode of twitching of his right leg followed at 6 months of age by generalized salaam-type seizures following which developmental delay became apparent.

The letter includes the following summary:

IMPRESSION: Bradley is a 4 year old with a developmental encephalopathy and intractable myoclonic seizures. The etiology of his difficulties is unclear despite an extensive evaluation. I have not yet had time to peruse his old chart in extreme detail to review all diagnostic studies. Given his hyporeflexia, one must raise the question whether there could be an element of peripheral neuropathy which might serve as a stimulus for further specific investigations. In addition, we will need to insure that he has had a complete biochemical work up including short, chain fatty acids and lysosomal enzymes although these are rare disorders without specific treatment.

Gary Bunting in the December 19, 1988, letter that transmitted the Additional Delivery documents, stated that the entry in the pediatrician's records for June 15, 1984,

was made when his wife Glenda called in to report a disturbing set of problems with Bradley but the entry was blank because the nurse failed to make note of it. The transmittal letter also includes:

Bradley's unusual symptoms did not begin with the second DPT shot. Immediately after the first shot, I noticed that Bradley stopped using his right hand. He also had unusual staring episodes. When this was brought to the attention of [the pediatrician], he stated that such behavior was not unusual for an infant of Bradley's age.

The Nemours Childrens Hospital neurologist did not testify at the July 13, 1989, hearing. Petitioner's Exhibit No. 4, a deposition taken on July 1, 1989, was admitted in evidence and read into the hearing record. Bradley's current condition was described as a disorder of the brain function, an encephalopathy, that is manifested by psychomotor retardation, intractable seizures, weakness in all four limbs. "Greater on the left then on the right." He has a history of infantile spasms. The condition is permanent. The deposition includes the following interrogation and response:

Q Have you performed any other test to ascertain possible causation?

A We have basically looked for every correctable cause of an encephalopathy. The tests that we have performed have included measurement of amino acids in the blood stream, organic acids in the blood stream. We have looked for possible endocrine causes and all the testing we have done on Bradley has come back negative and I am unable to establish an etiologic cause for his encephalopathy.

During the hearing, Gary Bunting testified that during the pregnancy Glenda Bunting did not undergo any trauma, had no injuries that could affect the fetus, had no injections that could affect the fetus, drank no alcohol, did not smoke, and that she had not indulged in "any non-prescribed drugs."

Gary Bunting testified that on March 2, 1984, shortly after the vaccination Bradley fell into a deep sleep which lasted approximately 20 hours—all the rest of the day,

through the night and part of the next day. On March 3, 1984, Bradley had a "staring episode"—staring fixedly in one direction for 15 to 20 minutes—when in an infant swing.

Gary Bunting also testified that on May 7, 1984, shortly after the vaccination, the site became puffy, swollen, red and tenderness that lead to uncontrollable crying. The crying was a different behavior from normal, was high pitched and shrill, and would continue "for several hours." One such crying episode was on the same day as the vaccination. The next day, he testified, he noticed Bradley's right leg was twitching rhythmically—at "about every five seconds" for "maybe 20 times." Such twitchings also were noticed on May 24, 1984.

Gary Bunting testified that a bending type of seizure was noticed in Jacksonville, in early June, and on June 15, a bending seizure caused Bradley's head to come forward into the tray of his high chair. This episode, he testified, was reported by telephone to the pediatrician's office on June 15, 1984.

Glenda Bunting testified at the July 13, 1989, hearing. She confirmed her husband's testimony that she had no problems during the prenatal period, and that she had no injury by trauma, by any type of physical accident, or any type of toxin such as drugs or alcohol or smoking, or any type of injection. She testified that Bradley slept an unusually long period after the first examination and had staring episodes the next day. She testified she kept a baby chart on which she had made a notation that he had slept all night, and that "it was the first night he had ever slept through the night." After the second vaccination, which was in the morning, Bradley started a crying episode after they returned home.

At the July 13, 1989, hearing, an expert medical witness testified for petitioner. The expert witness was a physician licensed to practice medicine and surgery in Michigan, who had received his M.D. degree in 1954 from George Washington University, and had interned at John Hopkins Hospital in Baltimore in 1954–55. His experience included two years at the National Institute of Health in research and electrophysiology, with six months there in clinical neurology; one year general surgical residency at Staten Island Public Health Service Hospital; two years in neurosurgery at Montreal Neurological Institute in Montreal, including clinical neurology, neuropathology and clinical neurosurgery; and full training in internal medicine at Jackson Memorial Hospital, Miami, Florida. He received a PhD in biochemistry from the University of Miami in 1968, then spent 6 years as a research at the Upjohn Company, Kalamazoo, Michigan. He completed his neurological training in 1975, and had held academic positions from 1975 to 1986.

Petitioner's medical expert witness testified that in preparation for his testimony he had reviewed certain medical records of the obstetrician, the pediatrician and Humana Hospital, and the July 1, 1989, deposition of the treating neurologist. He testified that in his opinion Bradley had an encephalopathy that was caused by the DTP vaccinations. This conclusion, as phrased in the transcript, was founded on "the extensive evaluations that were done with respect to other causes did not yield, as a result of an appropriate and competent evaluation, any cause other than the DPT inoculation, especially the second one, which probably result in the encephalopathy as a result of sensitization due to the first inoculation, in an unfortunately predisposed individual." He testified the neurological tests were not adequate to establish whether or not the encephalopathy was "non-progressive."

In the expert's opinion, the information available established Bradley had both a seizure disorder and an encephalopathy. His testimony described characteristics that supported his opinion: at the time seizures began Bradley developed relative disuse of the upper right extremity, and later some changes in right lower extremity, which could indicate a hemiparesis or one-sided weakness, or a result of asymmetrical damage, which is known to occur in adverse response to DTP. No other cause

has emerged after exhaustive work up and evaluation of other potential causes that could be expected to account for the asymmetry. The work up for other causes did not lead to a diagnosis of cerebral palsy, tuberous sclerosis, or other abnormalities associated with congenital abnormality.

The medical expert's final opinion was expressed as follows:

> And other tests that were done still lead to no other conclusion, in my opinion, than that he is one of the relatively few individuals who received this type of inoculation that have been documented to have an adverse effect with a resulting encephalopathy.

### Disposition

Eligibility for compensation under the Program requires petitioner to show by a preponderance of the evidence in the record that Bradley's condition was caused by the DTP vaccination. The Program is subject to temporal and evidentiary standards that are designed to facilitate proof of eligibility and to accomplish an expeditious resolution of the claim. The standards established in the Act express the public interest for realization of Program objectives. Inclusion of specific standards on eligibility for compensation makes it inevitable that cases will arise where a petitioner will be excluded because the criteria are not met.

Petitioner claims that Bradley has an encephalopathy, a chronic (myoclonic) seizure disorder, and a series of related neurological complications associated with these illnesses; and that these illnesses and complications were caused by the DTP vaccina-

tions. The first symptoms of these illnesses are claimed to have occurred within the Program's temporal standards.

Respondent's medical review asserts the evidence shows Bradley's course is typical of cryptogenic infantile spasms and myoclonic epilepsy which are due to a chronic, possibly progressive encephalopathy. Respondent's medical review states Bradley's epilepsy is intractable, and the evidence shows characteristics of a Pervasive Developmental Disorder (Autism). Respondent claims evidence in the record does not satisfy the Program's temporal and evidentiary standards.

In the Program, a presumption of causation applies when there is a demonstration that the injury or condition was first manifested within the time periods listed in the Vaccine Injury Table. For either an encephalopathy related to DTP, or, a residual seizure disorder related to DTP, the time period on the Vaccine Injury Table is 3 days.[10]

To establish a residual seizure disorder, the evidence must show (1) that there have been no afebrile seizures prior to administration of the vaccine, (2) the first seizure must have occurred within 3 days after the vaccination, and (3) two or more seizures occurred within 1 year after the vaccination.[11]

The Vaccine Injury Table does not include specifically "infantile spasms" among the chronic seizures listed.[12] "Encephalopathy" is a defined term in the aids to interpretation of the Table. The term "infantile spasms" is not included in the list of

---

10. Section 14(a) I, B and D.

11. Section 14(b)(2)(B) states:
    A petitioner may be considered to have suffered a residual seizure disorder if the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first seizure or convulsion after the administration of the vaccine involved and if—

    \*     \*     \*     \*     \*     \*

    in the case of [DTP], the first seizure or convulsion occurred within 3 days after ad-

ministration of the vaccine and 2 or more seizures or convulsions occurred within 1 year after the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

12. Section 14(a)I.

manifestations, or in the list of signs and symptoms.[13]  An encephalopathy is to be considered a condition set forth in the Table if it is not possible to determine the cause of the encephalopathy by a preponderance of the evidence.[14]

In this case, the evidence as to the time of the first seizure or of the first sign or symptom of an encephalopathy, is conflicting.  The parents claim that the seizures or symptoms occurred shortly after the first vaccination on March 2, 1984.  The baby chart that Glenda Bunting described in her testimony was not offered as evidence and is not in the record.  There is no medical record that a seizure or symptom occurred at that time before such a description was included in the September 9, 1988, letter from the treating neurologist's colleague, who had been called in for consultation.  That account was based on a statement by Bradley's father at an examination on September 9, 1988.

■  All of the evidence in the record—the September 9, 1988, letter from the treating neurologist's colleague; petitioner's December 19, 1988, transmittal letter, and the testimony at the July 13, 1989, hearing—that places the time of the first seizure or listed encephalopathy symptom within the 3–day period are derived from statements made by the petitioner on September 9, 1988, or later.  The evidentiary standards of the Program prohibit a finding based on the claims of the petitioner alone, unsubstantiated by medical records or by medical opinion.[15]

■  The standards permit a finding of first symptom or manifestation of onset of any injury or condition within the Vaccine Injury Table time period, even though not recorded or incorrectly recorded in the medical records.  Such a finding, however, must be made only on a demonstration by a preponderance of the evidence that the onset did in fact occur within the Table period.[16]

13.  Section 14(b)(3)(A) provides:

The term "encephalopathy" means any significant acquired abnormality of, or injury to, or impairment of function of the brain.  Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions.  The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment.  Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy.  Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

14.  Section 14(b)(3)(B) provides:

If in a proceeding on a petition it is shown by a preponderance of the evidence that an encephalopathy was caused by infection, toxins, trauma, or metabolic disturbances the encephalopathy shall not be considered to be a condition set forth in the table.  If at the time a judgment is entered on a petition filed under section 300aa–11(b) of this title for a vaccine-related injury or death it is not possible to determine the cause, by a preponderance of the evidence, of an encephalopathy, the encephalopathy shall be considered to be a condition set forth in the table.  In determining whether or not an encephalopathy is a

condition set forth in the table, the court shall consider the entire medical record.

15.  Section 13(a)(1) provides:

(1) Compensation shall be awarded under the Program to a petitioner if the court finds on the record as a whole—
(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and
(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.
The court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

16.  Section 13(b)(2) provides:

The court may find the first symptom or manifestation of onset or significant aggravation of an injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period.  Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did in fact occur

In this case, the first notation in the medical records regarding seizure activity is on June 28, 1984. Petitioner asserts that a call was made to the pediatrician on June 15, 1984, and the blank entry in the pediatrician's record for that date is due to the failure of the nurse to make a note. If this contention is accepted as fact as to the June 15, 1984, blank, the medical records still would not place the event within the required 3–day period after the second vaccination administered on May 7, 1984.

This is not a situation where the relevant contemporaneous medical records are silent as to the time of first onset. There are numerous entries that are based on memories of the parents that affirmatively place the first seizure or symptom on June 28, 1984, or later. The pediatrician's notes at WWMC, the Admission notes of Humana Hospital and the July 4, 1984, request at Humana Hospital for an EEG, the July 23, 1984, office note of the neurologist at the Medical Center Clinic in Pensacola, and the September 4, 1984, admission memoranda at Nemours Childrens Hospital Neurology Clinic, all fix the onset of Bradley's condition in late June or early July 1984.

Contemporaneous written records have stronger evidentiary value than subsequent memory recall after a significant time lapse. The records of the parents' descriptions of the events made at times close to the event are given greater weight than records of the parents' descriptions of those events made years later.

■ The preponderance of the evidence in the record of this case does not establish that the onset of seizure activity or other symptom of an encephalopathy did in fact occur within 3 days of the March 2 or May 7, 1984, administrations of the DTP vaccine. Petitioner has not met the temporal standards of the Vaccine Injury Table and is not entitled to the presumption of causation in the Program.

Materials in the record establish that Gary and Glenda Bunting have been concerned deeply to identify and relieve Bradley's condition, and that this concern has been persistent throughout the entire period of his illness. They have shown an unwavering devotion and have exerted extraordinary effort in their cooperation with the doctors' attempts to identify the cause and to find an effective treatment. The emotional and financial burden that results from Bradley's illness is severe; their efforts merit the highest commendation. Participation in this new Program would provide assistance that will be needed throughout Bradley's foreseeable future. In such circumstances, to examine in detail past history in attempt to find compliance with the Program requirements is permissible. To emphasize those aspects that would show compliance is not wrong, and a failure to recall unfavorable parts of the past record is understandable.

■ The Program permits compensation in situations where the petitioner cannot meet the time standard of the Vaccine Injury Table. Compensation may be paid when the onset of the injury or condition did not occur within the Table period, if a preponderance of the evidence establishes that the injury or condition was caused by the vaccine,[17] and if there is not a preponderance of the evidence that the illness or condition is due to an alternative cause.[18] Both standards of evidence must be satisfied before

within the time period described in the Vaccine Injury Table.

**17.** Section 11(c)(1)(C)(ii)(II) provides:
    A petition for compensation under the Program for a vaccine-related injury or death shall contain—
    (1) an affidavit, and supporting documentation, demonstrating that the person who suffered such injury or who died—
        *   *   *   *   *   *
    (II) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table the first symptom or manifestation of the onset or significant aggravation of which did not occur within the time period set forth in the Table but which was caused by a vaccine referred to in subparagraph (A).

**18.** Section 13(a)(1)(B).

compensation can be paid under the Program.

That Bradley has an encephalopathy is clear on the record. Respondent's medical review so concluded, as did the treating neurologist and petitioner's medical expert witness. It is not clear on the record whether the infantile spasms, hypsarrythmia, and partial seizures experienced by Bradley are characteristics of an encephalopathy or a residual seizure disorder compensable under the Program because they result from administration of DTP vaccine.

Respondent's medical review concludes that Bradley suffers from infantile spasms and epilepsy. Respondent points out that infantile spasms are not addressed in the Vaccine Table and that current medical literature does not support a causal relationship between DTP vaccination and infantile spasms.

■ The treating neurologist in his deposition testified that, although he had looked for every correctable cause for an encephalopathy, he was unable to establish an etiology for Bradley's encephalopathy. This statement may be sufficient to support a conclusion that the encephalopathy is a condition set forth in the Table on the ground that it is not possible to determine its cause.[19] The treating neurologist's statement is not a medical opinion that substantiates the testimony of Bradley's parents as required by section 13(a)(1)(B). The statement is not equivalent to a medical opinion that the DTP vaccines were the cause of the encephalopathy. The treating neurologist's deposition, moreover, disregards seven EEG reports in the record which were signed by him, that indicate the tracing is that of hypsarrythmia.

The neurologist at MCC in Pensacola, who examined Bradley on July 23, 1984,

advised the parents that his major concern was whether Bradley had a partial seizure or whether he had infantile spasms. The EEG was stated to be compatible with either, and "one thinks about hypsarrythmia when one thinks about infantile spasms."

Petitioner's medical expert developed his opinion that Bradley's injury was caused by the vaccine by reliance on the various tests and work ups that were done, which he concluded ruled out all other possible causes. The medical expert's preparation for his appearance was hurried. His testimony centered upon facts outlined in a letter that had previously been provided by petitioner's counsel "that says that I expected the following testimony to be deduced from the parents." The medical records he examined apparently were limited to those attached to petitioner's exhibits delivered at the July 13, 1989, hearing. It is doubtful that the medical records provided to petitioner's expert witness included the July 23, 1984, report to the pediatrician from the neurologist at MCC in Pensacola.

The Program is designed to give effect to the overall objective to make an award when entitlement to compensation has support in the record. Materials in the record are to be construed liberally for petitioner. In determining whether to award compensation, the court is directed to consider in addition to all other relevant medical and scientific evidence contained in the record, *any* diagnosis, conclusion or medical judgment contained in the record regarding the nature, causation and aggravation of petitioner's condition, as well as the results, summaries and conclusions of any diagnostic or evaluative test contained in the record. The court is directed to consider the entire record and the course of the condition until the date of judgment.[20]

**19.** Section 14(b)(3)(B).

**20.** Section 13(b)(1) provides:

(1) In determining whether to award compensation to a petitioner under the Program, the court shall consider, in addition to all other relevant medical and scientific evidence contained in the record—

(A) any diagnosis, conclusion, medical judgment, or autopsy, or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death, and

(B) the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions.

Any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the court. In evaluating the weight to be afforded to any such diagnosis,

■ Under the Program, the opinion of petitioner's medical expert must be considered in conjunction with all relevant materials in the entire record. The Act makes it clear that the medical expert's opinion and conclusions are not binding on the court. The conclusions of an expert witness are no better than the soundness of the reasons that stand in support of them.[21] Uncontradicted opinion is not conclusive if it is intrinsically nonpersuasive.[22]

Evidence in the record of this case may support the conclusion that there is not a preponderance of evidence that Bradley's condition is due to factors unrelated to the DTP vaccination. Evidence in the record, however, does not establish that petitioner has demonstrated by a preponderance of the evidence that the DTP vaccinations caused Bradley's present condition.

■ Petitioner's medical expert did not provide an explanation of the connection between the vaccinations and Bradley's present condition. His analysis is an allegation that at best is speculative. This is insufficient to satisfy a preponderance of the evidence standard. Petitioner's medical expert's opinion is "an explanation consistent with known facts or conditions, but not deductible from them as a reasonable inference."[23]

Inasmuch as petitioner has not satisfied the standards applicable to establishing entitlement to compensation, further consideration in this de novo proceeding on the remaining issues is unnecessary. Accordingly, no disposition is made as to adequacy of the life plan presented by petitioner or of the calculation of cost of future medical expenses, or of the calculations for the amount of any judgment to be entered that would be in addition to an amount to cover reasonable attorneys' fees and other costs.

*Attorneys' Fees*

In a case where an award of compensation is not made, the Act authorizes the judgment to include an amount to cover reasonable attorneys' fees and other costs.[24] In a retrospective case, if there is no award for loss of earnings or for actual and projected pain and suffering, the amount for attorneys' fees and other costs may not exceed $30,000.[25]

Petitioner's attorney has filed a claim for legal services in this case and for costs and other expenses. The claim is supported by an affidavit of the attorney, affidavits of two experienced attorneys licensed to practice law in the State of Florida and in Federal courts, and by relevant office records. The claim is for 186.9 hours of compensable legal services at an hourly rate of $100, a total amount of $18,690. The claim for related allowable costs is for $11,355.92. The total claim is for $30,045.92.

Reasonable compensation for attorneys' fees, in the initial stages of this innovative Program, has varied substantially in the recommendations of the special masters and in the judgments of the court. Special masters have recommended hourly rates that range from $100 per hour to $290 per hour; the court's judgments have included attorneys' fees compensation based on hourly rates from $75 per hour to $290 per hour. Both the special masters' recommendations and the court's judgments have included numerous intermediate levels within these ranges.

Analyses in support of determinations of the amount allowable as a reasonable attorneys' fee have included a variety of factors and considerations. One system of analysis involves application of the Equal Access

---

conclusion, judgment, test result, report, or summary, the court shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the court.

**21.** *Fehrs v. United States,* 620 F.2d 255, 265, 223 Ct.Cl. 488 (1980).

**22.** *Sternberger v. United States,* 401 F.2d 1012, 1016, 185 Ct.Cl. 528 (1968).

**23.** *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983) (plaintiff failed to prove by a preponderance of the evidence that her injury was caused by administration of a swine flu vaccine).

**24.** Section 15(e)(1)(A) & (B).

**25.** Section 15(b); *see Hanagan v. Secretary of DHHS,* 19 Cl.Ct. 7 (1989).

to Justice Act (EAJA) standard of $75 per hour as a fair and reasonable starting, or lodestar, rate for cases in the Vaccine Compensation Program. *See* opinions in *Pusateri v. Secretary of DHHS*, 18 Cl.Ct. 828 (1989); *Moorhead v. United States*, 18 Cl.Ct. 849 (1989); *First Commercial Bank v. Secretary of DHHS*, 19 Cl.Ct. 226 (1989).

The Court of Appeals for the Federal Circuit has not addressed the variance that has developed in application of standards relevant to computation of reasonable attorneys' fees under the National Vaccine Injury Compensation Program. The organizational structure of the special master's function, and procedures for initial determinations and reviews, in the Program have been changed in the Vaccine Injury Compensation Technical Amendments of 1989. As a result, the content of the term "reasonable attorneys' fees" continues to involve uncertainty.

The EAJA's $75 per hour limit may be adjusted to reflect an increase in the cost of living. The Courts of Appeals for the District of Columbia and for the Second Circuit have interpreted the EAJA, as amended in 1985, to require use of the 1981 effective date of the original act as the starting point from which to calculate increases in the cost of living that may justify a higher fee. *Trichilo v. Secretary of DHHS*, 823 F.2d 702, 705–07 (2d Cir.1987); *Hirschey v. F.E.R.C.*, 777 F.2d 1, 5 (D.C. 1985); *Keyava Const. Co. v. United States*, 15 Cl.Ct. 135 (1988).

The CPI–U index in October 1981 stood at 93.4; the average for 1989 is 124.- 0. This represents a 32.76 percent increase. Application of this adjustment factor to the $75 per hour rate produces a cost of living increase of $24.57, and an hourly rate of $99.57. On the basis of the foregoing, the $100 per hour rate that petitioner's counsel has requested is considered to be reasonable under the Program.

*Conclusion*

On the basis of the foregoing findings of fact and conclusions of law, it is determined that petitioner is not entitled to compensation under the Program. The Clerk is directed to enter judgment for attorneys' fees and other costs under the Program in total amount of $30,000. No additional costs are to be paid.