Antonia L. JOHNSTON, as Parent and
Natural Guardian for Jason
Johnston, Petitioner,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 88–30V.

United States Claims Court.

Nov. 19, 1990.

William J. Stapleton, Ann Arbor, Mich.,
for petitioner.

Carol Essrick, Washington, D.C., with
whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION [1]

HODGES, Judge.

This case is before the court on respondent's motion for review. Special Master George L. Hastings, Jr., has determined that the petitioner Antonia Johnston, as parent and natural guardian for Jason Johnston, is entitled to recover compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1–300aa–34 (Supp. V 1987), *as amended* by several public laws codified in 42 U.S.C.A. §§ 300aa–1–300aa–34 (West Supp.1990) (the Act).

Respondent contends that the special master's findings of fact and conclusions of law were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Oral argument was held on September 6, 1990. For the reasons discussed herein, the decision of the special master is SUSTAINED.

## FACTS

Jason Johnston was born to petitioner Antonia L. Johnston on August 15, 1982. He apparently was born healthy. On Octo-

---

**1.** This opinion may contain information that may not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12(c)(2) (Supp. V 1987). Accordingly, within fourteen days after the date of this opinion, the parties shall designate any material subject to section 300aa–12 and such des- ignated material will be deleted for public access. If on review of this report by the parties, there are no objections filed within the fourteen day period, then it shall be deemed that there is no material subject to section 300aa–12.

ber 22, 1982, Jason was given his first "DTP" (diptheria, tetanus, pertussis) immunization by Dr. Richard Bayles. On December 17, Dr. Bayles gave Jason his second DTP vaccination.

On December 31, 1982, Jason was admitted to Children's Hospital of Michigan. At various times between his first vaccination and his admission into the hospital, Jason exhibited quick jerking movements, spasms, excessive crying, repeated diarrhea, and vomiting. The jerking motions from which he had been suffering were labeled "infantile spasms" and "myoclonic seizures." He stayed at the hospital for eight days.

On October 7, 1988, petitioner filed an action for compensation pursuant to the Act. The special master held several evidentiary hearings. Testimony showed that Jason suffered from a seizure disorder and encephalopathy. Respondent withdrew prior to these hearings and participated afterwards only to the extent of filing a document entitled "VICB Medical Review" (Review). This was the only evidence or argument submitted by the respondent to the special master.

Special Master Hastings issued a decision on May 21, 1990. He found that Jason's injury was seizure disorder and encephalopathy, and that his symptoms occurred within three days of his first immunization. He found that an aggravation of Jason's seizure disorder and encephalopathy occurred within three days of his second vaccination.

The special master also ruled that Jason's condition was a Vaccine Table Injury (Table Injury) pursuant to section 300aa–14(a). He found the Table Injury occurred within three days of the vaccine and it was not "due to factors unrelated to the administration of the vaccine" as defined in section 300aa–13(a)(1)(B).

## DISCUSSION

### 1. Standard of Review

The Act provides that upon review of a special master's decision, the court may:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C.A. § 300aa–12(e)(2).

The arbitrary and capricious standard is a narrow one. "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir.1990) (touchstone of the arbitrary, capricious, and abuse of discretion standard is rationality; upon consideration of relevant factors and no clear errors of judgment, the decision should be affirmed).

### 2. The Act

To come within the Act, petitioner must show by a preponderance of the evidence that he sustained a Table Injury and suffered symptoms of that injury within three days, in the case of DTP vaccine. At that point, the special master must determine that the injury was not caused by factors unrelated to the vaccine. 42 U.S.C.A. § 300aa–13(a)(1)(B). The unrelated cause must be a real, known, accepted condition. 42 U.S.C.A. § 300aa–13(a)(2)(A). That is, to deny compensation to petitioner for a Table Injury, the special master must determine with some degree of certainty an alternative cause of petitioner's injury.

The Act and its legislative history indicate a tilt in favor of the petitioner. The petitioner's duty is to establish the seven factors of section 300aa–11(c)(1), including the timing of the first symptom, and to substantiate his case with medical records

or medical opinions. 42 U.S.C.A. § 300aa–13(a). At that point, the special master determines whether the injury was caused by some other problem. 42 U.S.C.A. § 300aa–13(a)(1)(B).

■ Doubt is resolved in favor of the petitioner. "[A]wards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R.REP. NO. 908, 99th Cong., 2nd Sess., pt. 1, at 3 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344. "The system is intended to be expeditious and fair. It is also intended to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation...." H.R.REP. NO. 908, 99th Cong., 2nd Sess., pt. 1, at 12 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin. News 6344, 6353.

An important issue in this case is whether a "factor unrelated to the administration of the vaccine" caused the injury. If the special master finds that petitioner's injuries were due to a provable cause which is unrelated to the vaccine, the injury is not compensable. A factor unrelated may not be an unknown or unexplained factor. If an alternative cause for the injury cannot be proved, petitioner recovers. This is the "tilt" to the petitioner which features this statute.

### 3. Factual Record

The factual record is weak in some respects. The VICB Medical Review offered by the respondent makes several significant assertions, yet there are no references or explanations. For example, the Review states that petitioner's infantile spasms preceded the immunization. This would be very important to the case. However, other statements indicate that the writers perhaps were aware only of the second vaccination.

There was an implication in the Review that important medical information was withheld. This was said by the doctors who wrote the Review to be important, and it would be. Yet, this was not mentioned at oral argument or otherwise by respondent.

Respondent's VICB Medical Review states that encephalopathy "did not occur." As used in the Act, encephalopathy means "any significant acquired abnormality ... or impairment of function of the brain." 42 U.S.C.A. § 300aa–14(b)(3)(A). Most descriptions of infantile spasms include hypsarrhythmia, or erratic brain wave. Dr. Harold Finkel, Jason's pediatric neurologist, uses the term to include any abnormality of the brain wave. "Infantile spasms is a particular type of seizure disorder where there is—basically, to describe it, it is totally chaotic type of brain wave activity." The doctors who wrote the VICB Review did not testify.

Respondent points out that testimony which is important to the factual issues in this case is uncertain and occasionally conflicting. The medical records of Dr. Bayles are limited. Dr. Bayles testified that he observed a spasm approximately five days after the shot, but did not record it. Yet, in response to a question from the special master, Dr. Bayles stated that the reaction that he saw was stronger than colic, and added, "I had never seen it before, the truth of it is." One would expect such a reaction, unique in a doctor's experience, to be mentioned in his patient's medical records. Dr. Bayles does not remember whether he saw the movement again.

The special master expressed similar concerns, but added, "Having observed these witnesses and formed favorable impressions concerning their credibility, I have concluded that their testimony outweighs any contrary inferences possibly to be drawn from the medical records." This is the value of being present when testimony is given and having the opportunity to ask follow-up questions.

The special master was impressed with the credibility and apparently the sincerity of the witnesses. It is not clear from the record that his factual findings are arbitrary or capricious.

### ARGUMENTS

#### 1. Lack of Corroboration

■ The problem with documentation in the medical records raises an important

legal issue. Only petitioner and family members placed the necessary symptoms within the required three-day period. Respondent points to the following sentence from section 300aa–13(a): "The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." The phrase "such a finding" for these purposes refers to petitioner's burden of showing the seven requirements set out in § 300aa–11(c)(1).

The special master relied on section 300aa–13(b)(2), which permits a finding that a Table Injury occurred within the statutory time frame "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Respondent argues that the latter section does not apply where medical records are entirely silent with regard to the alleged Table Injury. Respondent says that the court *may not* find that a Table Injury occurred if the only evidence thereof is oral testimony.

Such an interpretation is not consistent with the aims of this Act. The two sections have different purposes. Section 300aa–13(a)(1) is a general admonition. It is an effort to weed out claims which have no medical basis to support the injury. But the language in section 300aa–13(b)(2) affects only one issue: When did the first symptom occur?

If the occurrence was not recorded at all, or was incorrectly recorded as having occurred outside the statutory period, the court nevertheless is permitted by section 300aa–13(b)(2) to find that it did occur, subject to the preponderance standard. Presumably, Congress felt that the relatively short time period permitted to recognize the problem, coupled with the subtle nature of some Table Injury symptoms, make such a special provision necessary.

### 2. Infantile Spasms

The issue of whether infantile spasms, by that name, can be a "factor unrelated" to DTP vaccine, and therefore not compensable under the Act, is new to this court. We pointed out that the term "infantile spasms" does not appear on the Injury Table, but the case did not turn on that fact. *Bunting v. Secretary of Health & Human Servs.*, 19 Cl.Ct. 738 (1990).

The government argues that because infantile spasms is a known, recognized disease, it qualifies as a "factor unrelated" under section 300aa–13(a)(1)(B). It says that the medical literature is uncertain about any relationship between this vaccine and infantile spasms.

In its motion for review, respondent identifies infantile spasms as West's Syndrome, "a well defined condition with a specific clinical picture and prognosis. The first clinical account was given by Dr. W. J. West in 1841, well before any immunization scheme in the United States." (footnote omitted).

According to respondent, there are "innumerable causes of West syndrome including pre and perinatal damage, neurocutaneous syndromes (especially tuberose sclerosis), cerebral malformations, metabolic disorders, and cerebral infections. Thus, it cannot be said that generally, the cause of Infantile Spasms is unknown."

Yet, respondent's VICB Medical Review states, "In approximately 50% of cases the etiology is not apparent and these are referred to as cryptogenic infantile spasms." The record includes various estimates that 30, 40 or 50% of infantile spasms are of unknown origin. References to infantile spasms suggest that it is used as a description of symptoms, the cause of which often is unknown. There are indications in the record that the term may be used loosely by medical personnel.

"One result (of studies since those of Dr. West) has been to strengthen the concept that infantile spasms should not be considered a distinct seizure pattern as suggested by many (Jeavons and Bower ... among others). Infantile spasms should be viewed as a syndrome." Lambroso, "A Prospective Study of Infantile Spasms: Clinical and Therapeutic Correlations," *Epilepsia*, 24:135–158, 146 (1983). Steadman's Medical Dictionary 1397 (24th ed. 1982), defines West's Syndrome as "an en-

cephalopathy in infancy characterized by infantile spasms, arrest of psychomotor development, and hypsarhythmia."

Respondent terms it a mere coincidence that the spasms occurred after the vaccination. In fact, petitioner's expert, Dr. Finkel, testified during one of the evidentiary hearings, "I've seen children with infantile spasms around 3 months of age, and children typically get the immunizations around the age of 3 to 4 months of age, so it's always a question is it the vaccine or is it just a coincidence that it started at the time of the vaccine."

However, Congress anticipated this very problem: "The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related." H.R. REP. NO. 908, 99th Cong., 2nd Sess., pt. 1, at 18 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6359.

The Act includes procedures for revising the Injury Table to add or remove injuries as medical knowledge develops. "Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors." *Id.*

During the evidentiary hearings, Dr. Finkel testified: "But looking at the time sequence, I would think it would be more— to use your terminology, more probable than not, as this [the vaccine] being an explanation for it [Jason's injury]...." When asked whether he could state with a degree of medical certainty whether Jason's seizure activity was related to the DTP vaccinations, Dr. Finkel testified that "there would be a correlation between the two factors." In addition, he testified that Jason has an encephalopathy and there was a "good probability that the two [Jason's injury and the vaccination] are correlated."

Respondent does not argue seriously that Jason's spasms could not qualify as a Table Injury, either as encephalopathy or as a residual seizure disorder. We merely point out, therefore, that residual seizure disorder is defined in the Act to include myoclonic seizures and signs. The jerking motions exhibited by Jason upon admittance to the hospital were labeled myoclonic seizures and infantile spasms. (The term "myoclonic" describes a type of seizure in which certain muscles or groups of muscles contract suddenly.) One of the articles referred to us by the respondent notes that "infantile spasms is a rare form of seizure disorder...." Glaze and Zion, "Infantile Spasms," *Current Problems in Pediatrics,* Vol. XV, No. 11, p. 18 (1985).

## CONCLUSION

The record does not show that the special master was arbitrary or capricious or acted contrary to law in finding that Jason suffered from a Table Injury. The condition known as cryptogenic infantile spasms does not qualify as a factor unrelated to the vaccine within the meaning of the Act, under the circumstances of this case.

We do not reach the question of whether a disease with an unknown or unexplained cause could ever qualify as a "factor unrelated" under this Act. The condition described as cryptogenic infantile spasms is closely associated with problems anticipated by Congress and listed on the Vaccine Injury Table.

The purpose and the philosophy of this Act require that a person who suffers from infantile spasms, and whose condition otherwise meets the requirements of the Act, is qualified for compensation under the Act unless the cause of the infantile spasms can be traced to a known factor which is unrelated to the vaccine. The Clerk is directed to enter judgment accordingly.