Debbie L. HALE, as parent and next
friend of Christopher Ryan
Hale, Petitioner,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 90–13V.

United States Claims Court.

Jan. 15, 1991.

**404**

Michael R. Hugo, Boston, Mass., Atty. of Record, for petitioner.

Michael P. Milmoe, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## ORDER

HARKINS, Senior Judge:

The Secretary of the Department of Health and Human Services, respondent, seeks review in the United States Claims Court under the National Vaccine Injury Compensation Program (the Program) of a decision by a special master. 42 U.S.C.A. § 300aa–12(e) (West Supp.1990). The Program was established in 1986 as part of the National Childhood Vaccine Injury Act, Pub.L. No. 99–660, Title III, § 311(a), 100 Stat. 3756. Procedures applicable to the functions of special masters, and review of decisions of special masters, however, were amended substantially in the Omnibus Budget Reconciliation Act of 1989 (1989 Amendments). Pub.L. No. 101–239, Title VI, § 6601(b), 103 Stat. 2285–94 (Dec. 19, 1989). Provisions of the Program are contained in 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West Supp.1990). Further citations to the Program in this order omit "42 U.S.C.A. § 300aa–."

Christopher Ryan Hale (Christopher) was born on March 26, 1977. The birth was uneventful, and Christopher was a healthy infant who enjoyed normal development. He received his first DTP (diphtheria-tetanus-pertussis) vaccination on May 4, 1977, without incident. On July 1, 1977, DTP was administered the second time by his pediatrician during a well-baby visit.

On July 3, 1977, the first of a series of episodes of twitching and jerking were observed. On July 12, 1977, Christopher was taken to the pediatrician who recorded that Christopher was having seizure-type activity. Thereafter the pediatrician diagnosed the condition as a seizure disorder. When the seizures did not come under good control, Christopher was referred to a pediatric neurologist at Denver Children's Hospital, who on August 24, 1977, advised the pediatrician that testing indicated: "Infantile spasms, hypotonia, and retardation of unknown cause."

Extensive testing has not established an etiology for the infantile spasms or for Christopher's condition subsequent to the second DTP vaccination. The special master found that Christopher is afflicted with hypotonic cerebral palsy, mental retardation, and seizure disorder, and so severely disabled that he always will need assistance and supervision on a full time basis.

Special Master E. LaVon French has managed this proceeding with commendable expedition and flexibility. Deborah Hale, Christopher's mother, filed the petition on January 3, 1990. Respondent's report filed May 4, 1990, recommended denial of the claim. Oral argument on petitioner's June 28, 1990, motion for partial summary judgment was heard on July 9, 1990, via telephone, with the special master in Texas, petitioner's counsel in Boston, and respondent's counsel in the special master's office in Arlington, Virginia. An evidentiary hearing was conducted in Denver, Colorado, on July 11 and 12, 1990. The special

master's decision, filed October 16, 1990, analyzed the evidence in the record, included specific findings of fact and conclusions of law, and concluded that petitioner was entitled to a lump sum award of compensation of $68,500, and an annuity contract to be purchased for approximately $1,554,398 to provide a stream of payments under an irrevocable reversionary inter vivos medical trust for the benefit of Christopher.

Respondent's motion for review is designed to focus on the special master's disposition of a claim that includes a diagnosis of infantile spasms. Respondent concedes that on the record as a whole a preponderance of the evidence permits a finding of compliance with the requirements of Section 2113(a)(1)(A). Respondent contends that the evidence in the record contains questions of fact and questions of mixed fact and law that preclude disposition on summary judgment. Respondent further asserts that the special master erred, as a matter of law, in the conclusion that Section 2113(a)(1)(B) permits a ruling that a diagnosis of infantile spasms does not constitute an alternative cause, or a ruling that it is not a defense against a finding of compensation for an on-the-table injury.

Respondent's motion for review does not challenge any of the other findings or conclusions made by the special master. Accordingly, no review is sought of the elements of the life care plan for Christopher, calculation of the elements of compensation, or the form the award is to take in this case.

The findings which respondent accepts include:

—Christopher has a residual seizure disorder.

—The infantile spasms that Christopher has been diagnosed as having can be seizures under the Vaccine Injury Table.

—Christopher's residual seizure disorder was made manifest first within the requisite 72 hours.

—Petitioner is entitled to a statutory presumption that the injury was caused by the DTP vaccine.

The responsibilities and functions of special masters in the Program's amended procedures are unique. The 1989 Amendments established a separate office of special masters within the Claims Court, administered by a chief special master, and gave that office special authority and considerable administrative independence in decisions on claims for compensation under the Program. Section 2112(c). The 1989 Amendments directed promulgation of separate rules for special masters, and established specific criteria the rules were to contain (Section 2112(d)(2)). Standards were established for conduct of proceedings on a petition (Section 2112(d)(3)(B)). Review of a special master's decision by the Claims Court is expected to be an exceptional occurrence rather than a routine procedure.

Prior to enactment of the 1989 Amendments, the Claims Court was authorized to review proposed findings of fact or conclusions of law prepared by the special master and to make a "de novo determination of any matter." 42 U.S.C. § 300aa–12(d)(1) (1988). *See Davis v. Secretary of HHS*, 19 Cl.Ct. 134 (1989); *Bunting v. Secretary of HHS*, 19 Cl.Ct. 738 (1990).

The 1989 Amendments preclude de novo review in the Claims Court of a decision of a special master.

A special master's decision may not be disturbed by the Claims Court unless the court finds it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The 1989 Amendments defined the Claims Court function in a review of a special master's decision in Section 2112(e)(2), as follows:

(2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

    (C) remand the petition to the special master for further action in accordance with the court's direction.

The report of the Conference Committee on the 1989 Amendments emphasized that an appeal to the Claims Court was to be "under very limited circumstances." The report states:

The Conferees have provided for a limited standard for appeal from the master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess., at 517, *reprinted in* 1989 U.S. Code Cong. & Admin.News 1906, 3112, 3120.

This limited scope of review is tailored to the concepts and objectives of the Program. The standard "arbitrary, capricious, an abuse of discretion or otherwise in accordance with law" is based on one of the criteria established by the Administrative Procedure Act (APA). 5 U.S.C. § 706 (1988). To the extent consistent with Program objectives to be attained through the Office of Special Masters, decisions interpreting the APA standard have application in a review of a special master's decision.

■ Under the APA standard, conclusions of law are considered de novo. *Rice v. Wilcox*, 630 F.2d 586, 589 (8th Cir.1980). On issues of law under the Program, recognition is to be given to the special master's expertise in the development of these novel procedures. A decision on issues of law applicable to the Program should be overturned only when error is unmistakenly clear.

■ When the Claims Court reviews a special master's decision, the court is required to engage in a searching and thorough review, but the scope of the inquiry is limited. The Claims Court may not substitute its own judgment for that of the special master. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). The special master's decision must articulate a rational connection between the facts found and the choice made. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "Arbitrary and capricious" includes decisions where the special master has relied on factors which Congress has not intended to be considered, or has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence, or is so implausible it could not be ascribed to a difference in view or a product of expertise. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Where there is conflicting evidence, appropriate deference is given the special master's findings of fact. *Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986).

■ The Claims Court review is limited to the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The term "record" is defined in Section 2113 of the Vaccine Act as the record established by the United States Claims Court in a proceeding on a petition filed under Section 2111. Accordingly, the record is limited to materials that have been filed with the Clerk.

■ If the evidence in the record has been considered, and such evidence provides a reasonable basis for the special master's finding, the special master's findings of fact may not be set aside. Mixed questions of law and fact, which entail the application of a legal standard to a given factual pattern, are to be reviewed under this new and narrower standard. *Eli Lilly & Co. v. Commissioner*, 856 F.2d 855, 861 (7th Cir.1988).

The 1989 Amendments directed the court to promulgate separate rules for the conduct of proceedings by a special master. In Section 2112(d)(2)(C), Congress directed that such rules "include the opportunity for

summary judgment" and, in Section 2112(d)(2)(D), that the rules "include the opportunity for parties to submit arguments and evidence on the record without requiring routine use of oral presentations, cross examinations, or hearings." In the conduct of a proceeding, Section 2112(d)(3)(B)(iv) only requires a special master to afford all interested persons an opportunity to submit relevant written information with respect to possible alternative causes not included in the Vaccine Table.

The statutory directions have been implemented in the Vaccine Rules. Rule 8(d) provides:

*Decision Without Evidentiary Hearing.* The special master may decide a case on the basis of written filings without an evidentiary hearing. In addition, the special master may decide a case on summary judgment, adopting procedures set forth in RUSCC 56 modified to the needs of the case. 19 Cl.Ct. XXVII.

RUSCC 56(d) establishes procedures to be followed with respect to motions for summary judgment. In this proceeding, the procedures were modified by the special master: the motion papers consist of a Motion for Partial Summary Judgment, with a supporting brief and exhibits, filed by petitioner on June 29, 1990, and a Response, filed by respondent on July 6, 1990. Petitioner's motion for partial summary judgment initially contained two issues: (1) Whether Christopher suffered symptoms within three days of the administration of the vaccine, and (2) Whether infantile spasms may be raised to rebut the existence of a table injury. At oral argument, issue No. (1) was withdrawn from summary judgment procedure. Respondent contends that issue No. (2), the infantile spasms issue, involves such questions of fact and mixed questions of fact and law that summary judgment should have been denied. At the evidentiary hearing, the special master precluded respondent from adducing testimony of respondent's designated medical expert, and prevented respondent from making a proffer as to what testimony the medical expert would have presented. The special master's denial of

an opportunity to present medical testimony is asserted to be arbitrary and capricious.

The record before the special master on the *infantile spasms* issue, at the July 9, 1990, oral argument, included a statement dated April 11, 1990, of respondent's named medical expert (Dr. Michael E. Cohen) which had been attached to the report respondent filed May 4, 1990, as well as 15 medical articles which were filed on June 20, 1990, and incorporated as part of the expert's report. The materials before the special master included a written statement dated July 3, 1990, by petitioner's expert that had been prepared in response to the report of respondent's expert.

The April 11, 1990, written statement of respondent's expert, Dr. Michael E. Cohen, included the following paragraph:

In conclusion, Christopher Hale is a youngster who would appear to have the cryptogenic form of infantile spasms. As it is well known and documented in the literature an etiology for infantile spasms is not found in approximately 50% of children with this problem. As is demonstrated in this case the onset of infantile spasms in early infancy, specifically of a cryptogenic nature invariably carries with it a bad prognosis. As you know, infantile spasms may initially manifest itself somewhere around the third or fourth month of life. Although a host of etiologies have been implicated in the cause of infantile spasms there has been no one unifying diagnosis. Unfortunately even though seizures may come under control, the children may be left with severe developmental delay.

The statement also contained the following paragraph:

It is my opinion that the development of the infantile spasms which usually begins at around 2 or 3 months of age happened to have its initial presentation at about the time that the child was due to receive his second immunization. These events appear to be independent of one another and do not have a cause and effect relationship. There is little if any

epidemiologic, microbiologic, immunologic or pathologic evidence to suggest the presence of a specific pertussis encephalopathy. In the absence of evidence that a pertussis encephalopathy exists and can be associated with infantile spasms, I must respectfully conclude that the 2 events, that is the DPT immunization and the onset of infantile spasms occurred temporally in the same time frame but were independent and not related to one another.

The July 3, 1990, written statement of petitioner's expert, Dr. Kinsbourne, in response to Dr. Cohen's statement, includes the following paragraph:

Contrary to the allegation that infantile spasms is a "distinct medical illness" (respondents' report, page 8), this is a "symptom complex, not a specific disease entity (Millichap, page 54). It is a reaction of the infant's brain to "severe cerebral damage" (Chao et al., page 67), that disappears or changes in character as the nervous system matures (Riikonen, 1983). Infantile spasms are classified into *symptomatic,* of known cause, with attendant neurological disability and poor prognosis, and cryptogenic of unknown cause, isolated, and better prognosis. (Note that Dr. Cohen is mistaken in holding that *cryptogenic* infantile spasms "invariably carries with it a bad prognosis" (page 2). The reverse is the case (Jeavons, page 46, Glaze and Zion, page 18, Lombroso, pages 141 and 150). On the above grounds, Christopher's syndrome is classifiable as symptomatic, pertussis vaccine injury being the known cause.

Special masters are authorized by Congress and in the rules of the court to employ summary judgment procedures. The function and concepts applicable to summary judgment in adversary litigation are well defined. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53. When all material facts are developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed. Cir.1984); *United States Steel Corp. v. Vasco Metals Corp.,* 394 F.2d 1009, 55 CCPA 1141 (1968).

A material fact is one which will make a difference in the result of a case. *See Curtis v. United States,* 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (Ct.Cl.1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). The substantive law identifies the facts that are material. The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Housing Corp. of America v. United States,* 468 F.2d 922, 924, 199 Ct.Cl. 705 (1972).

■ Respondent contends that the refusal to permit Dr. Cohen to testify with respect to the medical literature is error and violative of the arbitrary and capricious standard. The facts as to Christopher's medical condition are not in dispute. There is no allegation that the testimony of respondent's expert, Dr. Cohen, would present factual information concerning Christopher's condition that would differ from his April 11, 1990, written statement. Dr. Cohen's testimony at the evidentiary hearing would not have provided information about infantile spasms that could clarify the differences in the medical experts' opinions beyond the status already reflected in the statements of Drs. Kinsbourne and Cohen. Nor would such testimony clarify the differences in medical concepts as to the relationship of the pertussis element of a vaccine to a diagnosis of in-

fantile spasms, beyond that in the extensive medical literature already in the record.

In the conduct of a proceeding, a special master is required only to afford all interested persons the opportunity to submit written information relevant to factors unrelated to the administration of the vaccine, or to an illness, disability, injury, or relating to an allegation that the injury or condition not on the Vaccine Injury Table, but which was caused by a vaccine. There is no requirement that oral testimony be taken to resolve differences in scientific or expert opinion. Opportunity for confrontation or cross examination is not required. A special master has discretion to determine whether testimonial evidence, in addition, to written statements is necessary.

■ In this case, oral testimony from the experts would not have resolved the conflicts in their statements as to whether the infantile spasms experienced by Christopher properly should be classified cryptogenic or symptomatic. More important than the conflict in the opinions of the parties' experts, moreover, was the status of infantile spasms in medical literature, and the construction of Section 13(a)(1)(B) of the statute as to the meaning of "factors unrelated to the administration of vaccine." Construction of statutory language is a legal matter, not a factual issue.

Accordingly, any factual issue that may have been present in the infantile spasms issue does not preclude use of the summary judgment procedure. Resolution of the infantile spasms issue by summary judgment was appropriate. The refusal to take the testimony of Dr. Cohen was within the discretion conferred by statute on a special master, and the absence of testimony of the infantile spasms issue does not amount to arbitrary or capricious conduct.

The Program is innovative and in its early stages, flexible procedures are to be encouraged. There is as yet no indication that repetitive appearances by the same counsel and experts for claimants threatens to result in the symbiosis that has been the bane of older regulatory agencies.

■ The legal question, whether a diagnosis of cryptogenic infantile spasms establishes an alternative cause that as a matter of law, under Section 2113(a)(1)(B), is unrelated to the administration of the vaccine, has been litigated in several other cases. *See, e.g., Grant v. Secretary of HHS*, No. 88–70V, slip op. (Cl.Ct.Supp. Report of the Special Master July 13, 1990); *Johnston v. Secretary of HHS*, No. 99–30V, slip op. (Cl.Ct. May 21, 1990); and *Alger v. Secretary of HHS*, No. 89–31V, slip op. (Cl.Ct. Mar. 14, 1990). In each case, after full presentation by the parties, the special masters have held that a diagnosis of infantile spasms of unknown origin is not evidence of an alternative cause.

In *Johnston v. Secretary of HHS*, the special master concluded:

> Therefore, where, as here, the description of a child as having "infantile spasms" says nothing about the *cause* of the child's seizure disorder, it cannot be said that the child's condition is "due to factors unrelated to the administration of the vaccine," within the meaning of that phrase as used in § 300aa–13(a)(1)(B).

No. 88–30V, slip op. at 8 (May 21, 1990). On review, the Claims Court sustained this conclusion. *Johnston v. Secretary of HHS*, 22 Cl.Ct. 75 (Cl.Ct.1990). With respect to respondent's contention that any correlation between administration of DTP and the onset of infantile spasms is coincidental, the reviewing court noted the following legislative history:

> However, Congress anticipated this very problem: "The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related." H.R.Rep. No. 908, 99th Cong., 2nd Sess., pt. 1, at 18 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6359.

The Act includes procedures for revising the Injury Table to add or remove injuries as medical knowledge develops.

"Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors." Id. (At 79).

The legal analysis and decisions in these other cases should have put the infantile spasms issue to rest. The decision in this case is in accord. Further exposition is made only in an attempt to forestall further repetitive litigation of this issue.

The statute establishes in two provisions a general rule for determination of eligibility and compensation. Section 2113(a)(1) provides:

> Compensation shall be awarded under the Program to a petitioner if the *special master or court* finds on the record as a whole—
>
> > (A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, *and*
> >
> > (B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The *special master or court* may not make *such a finding* based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion. (Emphasis supplied.)

The term "factors unrelated" is defined in Section 2113(a)(2) as follows:

> For purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"—
>
> > (A) *does not* include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, *and*
> >
> > (B) *may*, as documented by the petitioner's evidence or other material in the record, *include* infection, toxins, trauma (including birth trauma and re- · lated anoxia), or metabolic disturbances which have no known relation

to the vaccine involved, but which *in the particular case* are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death. (Emphasis supplied.)

The special master ruled as a matter of law that a diagnosis of cryptogenic infantile spasms precludes a finding that Christopher's condition was due to a "factor unrelated." Respondent argues that, as a known illness or condition, infantile spasms is a "factor unrelated" to the administration of the vaccine. Respondent notes that in the scientific literature, in 85–95 percent of the cases, the onset occurs before the age of one year, with the peak at 5 months, and therefore is coincidental with the timing of the DTP vaccination. Respondent further argues that infantile spasms is a known *condition,* and that it is not necessary to know the cause of the condition in order to find that this condition is a "factor unrelated" to the vaccine administration.

In the scientific literature in this case, infantile spasms may be classified in two broad categories based upon their etiologic associations: cryptogenic and symptomatic. In approximately 40% of all infants diagnosed for infantile spasms (the cryptogenic class), no etiologic factors can be identified. In the remaining 60% (the symptomatic group), there are known etiologic factors for the infantile spasms. These factors include cerebral dysgenesis, intrauterine infections and genetic disorders.

The medical literature in the record is equivocal. There is considerable variation in the medical literature as to whether the pertussis component of the vaccine may be a causative factor in infantile spasms.

Respondent's analysis of Section 2113(a)(2) ignores the literal meaning of the statutory terms. The statute defines what a "factor unrelated" does not include and what it may include. The subsections are in the conjunctive and must be considered together. In subsection (2)(A), the term "factors unrelated" does not include any condition that is "idiopathic, unexplained, unknown, hypothetical, or undocumentable." The objective of subsection (2)(A),

clearly, is to require clear and positive proof as to the presence of any alternative cause.

Respondent's analysis turns the meaning of subsection (2)(A) on its head. Respondent argues:

> Thus, the statute implies that a "factor unrelated" *may* include: any non-idiopathic, explained, known, non-hypothetical or documented cause, factor, injury, illness or condition. Taking a literal grammatical reading of this provision of the statute further, a "factor unrelated" may include a condition, as long as it is "explained," "documentable," or "known." Infantile spasms is a known and documentable condition, and therefore meets the literal terms of the statutory definition of a "factor unrelated." ...

This analysis is strained and unreasonable. It obfuscates the objective of what causes are meant to be excluded by the term, and it derogates from the Program's impetus to award compensation in cases where proof is unclear.

Subsection (2)(B) provides a list of conditions which may be included as "factors unrelated," even though there is no known relation to the vaccine involved, but which in the particular case are shown to have been principally responsible for the petitioner's illness, disability, injury, condition or death. The listed conditions in subsection (2)(B) are not intended to be exhaustive. The critical language, however, is the requirement that the condition be shown to have been "principally responsible" even though there is no known relation to the vaccine. The objective of subsection (2)(B) is to permit a nonvaccine related alternative cause, that in a particular case is principally responsible, to be recognized.

To establish that Christopher's condition is due to "factors unrelated" to the DTP vaccination, it is not sufficient to show that infantile spasms is not excluded under subsection (2)(A). There must also be a showing that in Christopher's case, infantile spasms were principally responsible for his condition. Subsection (2)(B) makes it necessary to show the cause of a condition before it can qualify as a "factor unrelated" to the vaccine administration.

The legislative history clarifies the content of the requirement in subsection (2)(B) that the condition was principally responsible in a particular case.

> If the injury is not demonstrated to have been *caused* by other, defined illnesses or factors and the injury is demonstrated to have met the other requirements of Section 2111 of the Table, the injury is to be *deemed* to be vaccine-related.

H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1 at 18, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6359. (Emphasis added.)

Cryptogenic infantile spasms cannot be considered a causative factor under Section 2113. To be considered an alternative cause, the underlying cause of infantile spasms must be shown. Cryptogenic infantile spasms by definition do not qualify.

----

For the foregoing reasons, on review of the record of this proceeding, the findings of fact and conclusions of law of the special master are upheld and the special master's decision is sustained. The Clerk is directed to enter judgment in accordance with the decision of the special master.